**In the United States District Court
for the District of Kansas**

———————

Case No. 23-cv-01231-TC

———————

SAMUEL S. PRAY,

*Plaintiff*

v.

SEDGWICK COUNTY, KANSAS, BOARD OF COUNTY COMMISSIONERS, ET AL.,

*Defendants*

———————

**MEMORANDUM AND ORDER**

After being subjected to a body cavity search, Samuel S. Pray sued the Sedgwick County Board of County Commissioners, Sheriff Jeff Easter in his individual and official capacities, and two additional law enforcement officers—Corporal William Breit and Officer Darin Bastin—in their individual capacities. Doc. 35. All defendants except Officer Bastin moved to dismiss. Docs. 36 & 48. For the following reasons, the Board and Sheriff Easter's motion is granted in part, and Corporal Breit's motion is denied.

**I**

**A**

A federal district court may grant a motion to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss for failure to state a claim, the complaint need only contain "a short and plain statement … showing that the pleader is entitled to relief" from each named defendant. Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Two "working principles" underlie this standard. *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). First, a court ignores legal

1

conclusions, labels, and any formulaic recitation of the elements. *Penn Gaming*, 656 F.3d at 1214. Second, a court accepts as true all remaining allegations and logical inferences and asks whether the claimant has alleged facts that make his or her claim plausible. *Id.*

A claim need not be probable to be considered plausible. *Iqbal*, 556 U.S. at 678. But the facts, viewed in the light most favorable to the claimant, must move the claim from conceivable to plausible. *Id.* at 678–80. The "mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

Plausibility is context specific. The requisite showing depends on the claims alleged, and the inquiry usually starts with determining what the plaintiff must prove at trial. *See Comcast Corp. v. Nat'l Assoc. of African Am.-Owned Media*, 589 U.S. 327, 332 (2020). In other words, the nature and complexity of the claim(s) define what plaintiffs must plead. *Cf. Robbins v. Oklahoma*, 519 F.3d 1242, 1248–49 (10th Cir. 2008) (comparing the factual allegations required to show a plausible personal injury claim versus a plausible constitutional violation with multiple defendants).

Ordinarily, a motion to dismiss is decided on the basis of the pleadings alone. *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009). But a "district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007) (citation and internal quotation marks omitted); *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1282 (10th Cir. 2019).

## B

Samuel S. Pray was arrested after dropping his sister off at the airport on July 30, 2023. Doc. 35 at ¶¶ 6 & 10.[1] An airport police officer suspected that Pray's car tag had expired, so he stopped the vehicle. *Id.* at ¶ 7. Once the officer checked the system, however, he realized that

---

[1] All references to the parties' briefs are to the page numbers assigned by CM/ECF.

Pray's tags were current. *Id.* The officer returned to his vehicle. *Id.* About ten minutes later, "two officers approached [Pray's] car and ordered him to exit." *Id.* at ¶ 8. They handcuffed Pray and stayed at the scene for another ten to fifteen minutes. *Id.* at ¶ 9. At that point, the officers informed Pray that they discovered a "$100 Environmental Warrant." *Id.* They soon learned that the warrant was associated with "grass over 12 [inches] high at a property titled to him."[2] *Id.* The officers transported Pray to the airport police station. *Id.* at ¶ 10. Another officer, Darin Bastin, arrived to take Pray to the Sedgwick County Detention Facility. *Id.*

Pray entered the detention facility. *Id.* at ¶ 11. Almost immediately, he observed "a rather large sign that said everyone going into intake would be subjected to a strip search, including civil and/or misdemeanor warrants." *Id.*

Corporal William Breit was the booking officer working with Pray. *Id.* at ¶ 12. Pray asked Corporal Breit if the detention facility would accept a credit card payment for the $100 bond. *Id.* Corporal Breit declined, confiscated Pray's phone, and told him he could "post bail or wait until Monday morning to speak with a judge." *Id.* Pray asked about the process, and Corporal Breit "pointed to a jail phone and told him to figure it out." *Id.* Corporal Breit and Officer Bastin immediately took Pray to another room. *Id.* at ¶ 13. They ordered him to "take off all his clothes," to "grab [his] nuts and turn around," and then to "bend over and cough several times." *Id.* They then searched his clothing while he stood in the room undressed. *Id.* When the strip search ended, Pray called a friend to bail him out. *Id.* at ¶ 14. While he waited for his friend, he "sat the entire time on a plastic chair near the jailer." *Id.* at ¶ 15. Pray was released on bond. *Id.* at ¶ 17.

Pray then brought this lawsuit. Doc. 1. He alleges that the "incredibly embarrassing and humiliating" body-cavity strip search violated his right to be free of unreasonable searches. Doc. 35 at ¶¶ 19–20. He

---

[2] Pray alleges that the basis for the warrant was the result of clerical error. In October 2021, Pray received a letter about the height of the grass at a rental property he owned. Doc. 11 at ¶ 17. He explained to the prosecutor that the property had been cleaned up, and an attorney for the city informed Pray that the case would be dismissed. *Id.* at ¶¶ 17–18. Evidently it was not. None of this is alleged to have been known by the defendants at the time these events transpired.

sued the two officers who conducted the search—Corporal Breit and Officer Bastin—as well as the Board and Sheriff Jeff Easter in his individual and official capacities. Doc. 35. He asserts that the Board and Sheriff Easter "are responsible for the policy and practice of requiring illegal searches at the Detention Facility." *Id.* at ¶ 20.

All but one of the defendants seek dismissal. The Board and Sheriff Easter jointly moved to dismiss. Doc. 36. Corporal Breit filed his own 12(b)(6) motion. Doc. 48. Generally speaking, they contend that Pray failed to plausibly state a claim for relief based on an unreasonable search. Doc. 37 at 4–14; Doc. 49 at 2–7. Officer Bastin did not move to dismiss.

## II

Pray plausibly alleged that Corporal Breit subjected him to an unconstitutional strip search pursuant to the Board's unlawful policy. But he failed to plausibly allege that Sheriff Easter personally participated in that violation. As a result, Sedgwick County and Sheriff Easter's motion to dismiss is granted in part and denied in part, while Corporal Breit's is denied.

### A

Invoking 42 U.S.C. § 1983, Pray alleges Defendants' conduct violated his Fourth Amendment right to be free from unreasonable searches.[3] The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "The basic purpose of this Amendment, as recognized in countless decisions of the Supreme Court, is to safeguard the privacy and security of individuals against arbitrary invasions by government officials." *United States v. Mathews*, 928 F.3d 968, 975 (10th Cir. 2019) (citing *Camara v. Mun. Ct. of S.F.*, 387 U.S. 523, 528 (1967) (internal quotations and citations omitted)).

---

[3] The defense of qualified immunity may be invoked in a motion to dismiss for failure to state a Section 1983 claim. *See Wood v. Moss*, 572 U.S. 744, 754–64 (2014). None of the individual defendants invoked that doctrine in their motions.

The Supreme Court most recently addressed the Fourth Amendment implications of body cavity searches for detention facilities in *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318 (2012). In that case, the Court recognized that the Fourth Amendment generally permits correctional officials "to devise reasonable search policies to detect and deter the possession of contraband in their facilities." *Florence*, 566 U.S. at 328. Applying this principle, the Supreme Court held that policies allowing blanket strip searches of all detainees may be permissible during the booking process even if they do not require individualized suspicion that a specific individual is carrying contraband. *Id.* at 338–39. Accordingly, under *Florence*, jails may conduct "the same search on any suspected offender who will be admitted to the general population in their facilities." *Id.* at 338. But the Court expressly declined "to rule on the types of searches that would be reasonable in instances where, for example, a detainee will be held without assignment to the general jail population and without substantial contact with other detainees." *Id.* at 338–39. This is because in those situations, the jail's need to conduct intensive searches of an individual absent individualized suspicion may diminish. *See id.*

Applying *Florence*, the Tenth Circuit held that a bright-line rule applies to body-cavity strip searches conducted as part of the booking process. In *Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204 (10th Cir. 2020), the Tenth Circuit held that absent individualized suspicion warranting a search, corrections officials may not strip search a detainee until they determine that the detainee will be housed in the facility's general population. *Hinkle*, 926 F.3d at 1237. Once the facility "determines that the detainee 'will be' placed in general population," then jail officials may conduct a body-cavity strip search even if they do not have individualized suspicion. *Id.* (quoting *Florence*, 566 U.S. at 322). This is because "absent admitting the detainee to the jail's general population, the jail would have no need to protect the new detainee, the existing detainee population, and the detention staff from infectious diseases, rival gang members, weapons, or contraband." *Id.* If a housing decision has not been made, then corrections officials may only strip search the detainee if they have probable cause to believe the detainee is "secreting evidence of a crime." *Id.* at 1239.

The parties agree that the rule articulated in *Hinkle* controls this case. Doc. 37 at 7; Doc. 41 at 9–12; Doc. 49 at 5–6; Doc. 59 at 7–8. They disagree, however, on two things. One is whether Pray plausibly alleged that the jail officials strip searched Pray before they decided to

5

house Pray in general population. Doc. 37 at 5; Doc. 49 at 2. The other is whether Pray plausibly alleged that the Board maintains an unconstitutional policy instructing officers to strip search detainees who enter the detention facility before a housing decision is made. Doc. 37 at 2; Doc. 49 at 2.

**1.** Pray plausibly alleged that Corporal Breit (and Officer Bastin) strip searched him in violation of the Fourth Amendment. Taking Pray's allegations as true, none of the jail officials, including Breit and Bastin, conducted any booking process or made a housing decision before they strip searched Pray. The facts alleged in the Complaint suggest that the only decisions Corporal Breit and Officer Bastin made were to strip search him and release him on bail. In fact, the allegations suggest that Corporal Breit and Officer Bastin would not have had time to make any housing determination because they were interacting with Pray until they strip searched him. *Cf. Colbruno v. Kessler*, 928 F.3d 1155, 1164–65 (10th Cir. 2019) (finding that the plaintiff's allegations describing events over several hours gave rise to the reasonable inference that the correctional official defendants had time to find clothing for the defendant). In particular, Pray alleges that Corporal Breit told him he could not pay bond with a credit card, confiscated his phone, and said he could "post bail or wait until Monday morning and speak with a judge." But before Pray could even use the facility's phone, Corporal Breit and Officer Bastin took Pray to another room and began the strip search.

Even after the search, there was no indication Corporal Breit and Officer Bastin contemplated placing Pray into the general population. When they finished the search, Pray was allowed to call a friend to bail him out and then "sat the entire time on a plastic chair near the jailer as they waited for the bond money to arrive." Pray alleges that "[a]t no time did the individual defendants believe that the plaintiff was going to be placed into the general population at the jail." These facts, which explain the sequence of events that occurred when Pray arrived at the facility, give rise to the reasonable inference that defendants conducted the body-cavity strip search before deciding to place Pray into general population. *See Mayfield v. Bethards*, 826 F.3d 1252, 1258 (10th Cir. 2016) (accepting the allegations concerning the sequence of events as pled in the complaint as true for purposes of a Rule 12 motion). And the fact that Pray never entered general population supports his allegation that Corporal Breit and Officer Bastin never made the decision to house him there. *See Hinkle*, 962 F.3d at 1241 (noting that but for the unlawful

decision to strip search of the plaintiff before a housing decision was made, he would not have been subject to the search because he was never housed in general population).

The facts alleged by Pray violate the rule announced in *Hinkle*. *See Hinkle*, 962 F.3d at 1237 ("By acting as it did, the County set the cart before the horse—it strip searched Hinkle before committing itself to admit him into its jail's general population."). As a result, Corporal Breit and Officer Bastin needed probable cause that Pray was "secreting evidence of a crime" before they could strip search him. *Id.* at 1239. Pray's allegations negate that notion. *See id.* (finding that corrections officials did not have probable cause or reasonable suspicion to strip search a detainee, who was not headed for general population and who was arrested for possessing a stolen trailer). Nor did Corporal Breit attempt to argue that they had such individualized suspicion.

**2.** Even though Pray sufficiently pled a constitutional violation, liability for individual-capacity claims requires that each defendant personally participated in the violation. Sheriff Easter and Corporal Breit contend Pray has not sufficiently alleged they personally participated in the violation. Doc. 37 at 13–14; Doc. 49 at 4.

The Tenth Circuit has held that there is "a need for careful attention to particulars, especially in [Section 1983] lawsuits involving multiple defendants." *Pahls v. Thomas*, 718 F.3d 1210, 1225 (10th Cir. 2013). This means plaintiffs are required to make it "clear exactly *who* is alleged to have done *what* to *whom*," as distinguished from collective allegations. *Id.* (citation and internal quotation marks omitted) (emphasis in original). That level of detail is necessary to satisfy the causation element of Section 1983 claim. *See Hall v. Witteman*, 584 F.3d 859, 864 (10th Cir. 2009); *see also Brown v. Montoya*, 662 F.3d 1152, 1163 (10th Cir. 2011) (quoting *Foot v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997)) ("Personal liability under § 1983 must be based on personal involvement in the alleged constitutional violation."). As such, "[a] plaintiff in a § 1983 action must allege that each defendant is subject to personal liability based on his [or her] own actions." *Cuervo v. Sorenson*, 112 F.4th 1307, 1314 (10th Cir. 2024).

Corporal Breit's argument fails. Pray alleges that Corporal Breit was the booking officer and that Breit directed Pray's actions leading up to the search. He also alleges that Corporal Breit and Officer Bastin "took Pray to an adjoining room and told him to take off all his clothes." Although he does not specify whether it was Corporal Breit

or Officer Bastin who ordered him to "grab [his] nuts," "turn around," or "bend over and cough," he alleges that Corporal Breit was one member of a two-person team that jointly strip searched him. That is sufficient. *See Bledsoe v. Carreno*, 53 F.4th 589, 610–12 (10th Cir. 2022) (finding that a complaint making specific allegations that a defendant participated in carrying out a constitutional violation, in combination with collective allegations against the defendants, plausibly alleged the defendant's personal participation).

It is different for Sheriff Easter. The only allegation in the Second Amended Complaint that mentions Sheriff Easter states that he "is the duly elected Sheriff of Sedgwick County, Kansas." There are no allegations that Sheriff Easter was present at the time of the alleged constitutional violation, let alone that he had contact with Pray that would give rise to a plausible inference that Easter personally participated in that violation. Nor are there any facts to suggest that Sheriff Easter even knew who Pray was or that he was brought to the detention facility, or that Sheriff Easter knew that any jail employees conducted a body-cavity search of Pray. Accordingly, Pray has not stated facts that plausibly allege a claim for relief against Sheriff Easter in his individual capacity. *Brown*, 662 F.3d at 1165 (affirming dismissal of a complaint that did not specifically allege any conduct of the defendant "or even that he knew about" the alleged violation).

**B**

In addition to the individual-capacity claims, Pray seeks to hold the Board liable for the deputies' unconstitutional conduct. By asserting that the Board had a policy requiring a strip search of all detainees, regardless of their housing assignment, Pray has sufficiently pled that he was strip searched pursuant to an official municipal policy or custom.

A municipal entity, or an officer in his or her official capacity, may be held liable under 42 U.S.C. § 1983, but not by way of respondeat superior. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 128 (1988). Instead, a plaintiff seeking to impose liability on a local government must establish that the harm-causing conduct was undertaken pursuant to an official municipal policy or custom. *See Monell*, 436 U.S. at 691; *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479-80 (1986). The Tenth Circuit has "recognized as policies meeting this standard" those that "aris[e] from a formal regulation or policy statement, an informal custom that amounts

8

to a widespread practice, decisions of municipal employees with final policymaking authority, ratification by final policymakers of the decisions of subordinates to whom authority was delegated, and the deliberately indifferent failure to adequately train or supervise employees." *Hinkle*, 962 F.3d at 1239–40.

Pray seeks to impose municipal liability by showing he was strip searched pursuant to a formal regulation or policy statement requiring unconstitutional conduct. In particular, he points to the sign in the facility said that "everyone going into *intake* would be subjected to a strip search, including civil and/or misdemeanor warrants." This policy could mean that everyone going into intake will be subjected to a strip search only *after* a housing decision is made. Or, perhaps, there may be evidence that deputies are trained to limit their strip searches consistent with *Hinkle* despite the language used. But Pray alleges that the text of the Board's policy, as reflected by the sign, is that everyone—regardless of whether they will be placed into general population—must be strip searched because they entered the facility and went through the booking process. Such a policy, if in place as Pray alleges, is unconstitutional "because it directs jail officials to strip search all detainees immediately upon arrival at the jail, before determining they 'will be' housed in its jail, and in the absence of probable cause that the detainees are secreting evidence of a crime." *Hinkle*, 962 F.3d at 1242. As a result, Pray has also met his burden to plead *Monell's* causation and state-of-mind requirements. *See Hinkle*, 962 F.3d at 1240 ("For the causation and state of mind elements, Hinkle can satisfy his burden by demonstrating that the County's policy is facially unlawful."); *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404–05 (10th Cir. 1997) (same).

The Board seeks to avoid liability, claiming it cannot be held liable for Sheriff Easter's policies. Specifically, it asserts that it lacks "authority to set policy for, or direct the operations of, the Sheriff's Office." Doc. 37 at 14. As a result, the Board contends that Pray cannot show that the Board established any policy authorizing Corporal Breit and Officer Bastin to unlawfully strip search Pray. Doc. 37 at 14. Indeed, Kansas law provides that the conduct of the Sheriff and his subordinates may not be controlled by the county commissioners at least insofar as personnel matters are concerned. Kan. Stat. Ann. § 19-805a; *Bd. of Cnty. Comm'rs of Cnty. of Lincoln v. Nielander*, 62 P.3d 247, 262–67 (Kan. 2003) (holding that Kansas law precludes boards of county commissioners from superseding Sheriffs' power over personnel matters).

The Board's argument is inconsistent with *Couser v. Gay*, 959 F.3d 1018, 1021 (10th Cir. 2020). In *Couser*, the Tenth Circuit considered whether a Kansas Sheriff acting in his or her law enforcement role is a state actor and therefore entitled to enjoy Eleventh Amendment immunity or a county official who was not. *See id.* at 1026. Distinguishing *Nielander* as involving personnel issues rather than law enforcement disputes between a Board of County Commissioners and a Sheriff, the Tenth Circuit held that Kansas Sheriffs exercising their statutory law enforcement duties are county actors. *Id.* at 1026–31. That conclusion undermines the assertion that a Kansas county cannot be liable for the unconstitutional conduct of its elected Sheriff. *See Bledsoe v. Bd. of Cnty. Comm'rs of Cnty. of Jefferson, Kan.*, 501 F. Supp. 3d 1059, 1141 (D. Kan. Nov. 18, 2020), *aff'd in part, rev'd in part sub nom. Bledsoe v. Carreno*, 53 F.4th 589 (10th Cir. 2022) (finding that the County can be sued for allegedly unconstitutional policy of Sheriff in light of *Couser*); *Sawyers v. Norton*, 962 F.3d 1270, 1278 n.4 (10th Cir. 2020) (relying on *Couser* to treat official capacity claims against Sheriffs as claims against the county).

### III

For the foregoing reasons, Sedgwick County and Sheriff Easter's Motion to Dismiss, Doc. 36, is GRANTED in part and DENIED in part, and Corporal Breit's Motion to Dismiss, Doc. 48, is DENIED.

It is so ordered.

Date: March 21, 2025　　　　　　　　  s/ Toby Crouse
　　　　　　　　　　　　　　　　　Toby Crouse
　　　　　　　　　　　　　　　　　United States District Judge