**In the United States District Court
for the District of Kansas**

———————

Case No. 23-cv-01231-TC

———————

SAMUEL S. PRAY,

*Plaintiff*

v.

SEDGWICK COUNTY, KANSAS, BOARD OF COUNTY COMMISSIONERS,
ET AL.,

*Defendants*

———————

**MEMORANDUM AND ORDER**

Samuel Pray sued two law enforcement officers—Corporal Wil-
liam Breit and Officer Darin Bastin—the Sedgwick County Board of
County Commissioners, and the Sedgwick County Sheriff, asserting
that he was subjected to an unlawful body-cavity strip search in viola-
tion of the Fourth Amendment. Doc. 35. The defendants moved for
summary judgment. Docs. 89 & 90. For the following reasons, Bastin's
motion is granted, and the other defendants' motion is granted in part
and denied in part.

**I**

**A**

Summary judgment is proper under the Federal Rules of Civil Pro-
cedure when the moving party demonstrates "that there is no genuine
dispute as to any material fact and the movant is entitled to judgment
as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" when it
is necessary to resolve a claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d
664, 670 (10th Cir. 1998). And disputes over material facts are "genu-
ine" if the competing evidence would permit a reasonable jury to de-
cide the issue in either party's favor. *Id.* Disputes—even hotly con-
tested ones—over facts that are not essential to the claims are

irrelevant. *Brown v. Perez*, 835 F.3d 1223, 1233 (10th Cir. 2016). Indeed, belaboring such disputes undermines the efficiency Rule 56 seeks to promote. *Adler*, 144 F.3d at 670.

At the summary judgment stage, material facts "must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671; *see also* D. Kan. R. 56.1(a)–(c). To determine whether a genuine dispute exists, the court views all evidence, and draws all reasonable inferences, in the light most favorable to the nonmoving party. *See Allen v. Muskogee, Okla.*, 119 F.3d 837, 839–40 (10th Cir. 1997). That said, the nonmoving party cannot create a genuine factual dispute by making allegations that are purely conclusory, *Adler*, 144 F.3d at 671–72, 674, or unsupported by the record. *See Scott v. Harris*, 550 U.S. 372, 378–81 (2007).

**B**

This is a dispute about the arrest of Samuel Pray. As detailed below, he was arrested pursuant to a bench warrant that (it turns out) was invalid, transported to the Sedgwick County Adult Detention Facility, subjected to a strip search, and released on $100 bond. The following facts are uncontroverted or, to the extent controverted, viewed in the light most favorable to Pray.

**1.** In July 2023, Samuel Pray was arrested. He was leaving the Wichita, Kansas, airport after dropping off his sister, when one of the airport's public-safety officers stopped his car. Doc. 88 at ¶ 2.a.i.[1] The officer, Justin Griner, initiated the traffic stop because he noticed that the registration sticker on Pray's vehicle had expired. *Id.* at ¶ 2.a.iii. Griner ran a driver's license check and discovered a municipal court bench warrant for Pray's arrest. *Id.*

But the municipal bench warrant should not have been issued. Griner told Pray that the warrant giving rise to his arrest was issued in 2021 for an environmental violation. Doc. 95 at 6, ¶ 13; Doc. 95-5 at 6–7. It all started when a tenant at Pray's rental property let the grass exceed the height allowed by the municipality's ordinance. Doc. 95-5 at 3–4. The City notified Pray of the violation, Pray sent pictures showing that the grass height was in compliance, and, within the week, an

---

[1] All document citations are to the document and page number assigned in the CM/ECF system.

assistant City attorney told him that the case was closed and that he did not need to appear in court. Doc. 95 at 6, ¶ 14. That same City attorney informed Pray—after he had been arrested and strip searched—that the warrant was "a glitch in the software system" and should not have been issued. *Id.* at ¶ 15. None of the officers involved in this litigation knew that the warrant was invalid.

The officer who initiated the traffic stop transported Pray to the airport police station. Doc. 88 at ¶ 2.a.iii–iv. At the airport police station, another airport public-safety officer, Darin Bastin, arrived and transported Pray to the Sedgwick County Adult Detention Facility. *Id.* at ¶ 2.a.v; Doc. 94 at ¶ 38. Bastin only transports arrestees to the county facility two or three times each year. Doc. 89 at ¶ 15. He is familiar with certain booking policies at the facility because arresting officers are involved in certain parts of the booking process when they bring an arrestee to the facility. *See id.* at ¶¶ 13–17. The parties agree, however, that Bastin was not an employee of the Sedgwick County Sheriff's Office. Doc. 88 at ¶ vi.

**2.** Pray was subjected to a strip search pursuant to an official policy promulgated by Sedgwick County Sheriff, Jeff Easter. A fulsome description of the procedures employed as to all arrestees generally provides context to Pray's specific experience and his resulting claims.

When an arresting officer first arrives at the detention facility with his or her arrestee, he or she will use a radio or intercom to seek admittance into a secure garage-like area known as the "sally port." Doc. 89 at ¶ 1; Doc. 89-5 at ¶ II.A.1. There is a sliding door in the sally port that leads to the interior of the facility. Doc. 94 at 3. Before taking an arrestee through the sliding door, the arresting officer must ensure "a thorough pat search and 'wanding' of an arrestee for contraband and/or weapons." Doc. 89-5 at ¶ II.A.5.

Next the arresting officer will take the arrestee to an area known as the arresting officer work area. Doc. 89 at ¶ 2. Before entering, the arresting officer "will handcuff the arrestee's hands behind their back prior to entering the officer's work area." Doc. 89-5 at ¶ II.B.2. While the arrestee is in the work area, he or she "will be secured to the benches via handcuffs." *Id.* at ¶ II.B.3. In the work area, the arresting officer will fill out paperwork and perform certain pre-booking tasks like property inventory, sobriety testing, and searches of inmates. Doc. 89 at ¶ 2.

From the work area, the arresting officer takes the arrestee to the booking area. Doc. 89 at ¶ 3. The general booking area has two smaller areas within it. Doc. 91 at 5, ¶ 14. The first is "the pit area," which is "a commons space with benches and telephones." *Id.* Arrestees wait in the pit area while they wait to be assigned to the second area of the booking area—the communal holding cells. Doc. 91-2 at ¶ 10. It usually takes a couple of hours before a new arrestee is assigned to a holding cell, "depending on staffing levels and intake volume." Doc. 91 at 5, ¶ 16. The communal holding cells contain "benches for sleeping, toilets, and sinks." *Id.* at 5, ¶ 14. Some arrestees stay in the holding cells for more than 72 hours. Doc. 91-2 at ¶ 10. While arrestees wait to go to a holding cell, they "are not segregated from other inmates or supervised individually." Doc. 91 at 5, ¶ 17. Instead, they "remain unrestrained in the general booking area with direct and frequent access to other detainees and corrections staff." *Id.*

Easter's policy classifies the general booking area, including the pit area and the communal holding cells, as part of the jail's general population. Doc. 91 at 5, ¶ 33. But this booking area is separate from the residential wing of the facility. Doc. 91-2 at ¶ 19. Inmates in the long-term residential pods, however, sometimes come to the general booking area to perform work assignments. *Id.* Pursuant to this policy, the defendants claim that they have "made the decision to house [an] individual in the general population of the jail" as soon as they accept custody over the defendant by initiating the booking process because the policy categorizes the entire booking area as general population. Doc. 91 at 4, ¶ 8. The record is devoid of evidence suggesting when the Sedgwick County Sheriff's Office employees typically make an individualized decision to release an arrestee from custody, house the arrestee in the long-term residential pods, or make other decisions regarding the facility's custody over the arrestee.

Under Kansas law, Easter has "charge and custody" over the jail. Doc. 91 at 3, ¶ 3. In July 2023, he adopted and began implementing the policy that requires his officers to conduct a body-cavity strip search of every arrestee who enters the general booking area. Doc. 89 at ¶ 4. That policy provides, in relevant part, that "[a]ll arrestees regardless of the charge status will be strip searched before being allowed into booking general inmate population." Sedgwick County Sheriff's Office General Order 106.02 Admissions Booking Procedures (July 1, 2023). The only arrestees who are not booked are individuals experiencing a medical emergency who are immediately transported to a

hospital instead. Doc. 91 at 4, ¶ 12. Even individuals who immediately post bond must go through the booking process, including the body-cavity strip search. *Id.* at 5, ¶ 18. In other words, anyone arrested in Sedgwick County is considered by the policy to be subject to a strip search, even if—like Pray—they will never be held in the facility's long-term residential pods and there is no probable cause to believe the arrestee possesses contraband.

Easter identifies several justifications for adopting his strip-search policy. Easter was concerned that detainees who worked in the booking area were taking contraband that was left in the booking area and bringing it into other parts of the facility. Doc. 89 at ¶ 11; Doc. 89-4 at 4–5; *see also* Doc. 89-2 at ¶ 5 (Bastin's declaration that he has seen "inmates moving about without restraints or escorts" in the booking area). Easter therefore adopted the policy "to address the jail's ongoing safety and security needs, including interdiction of contraband, identification of gang affiliations, and detection of communicable health conditions such as lice, infections, or wounds." Doc. 91 at 4, ¶ 9. Easter was particularly concerned about "the increasing risk of overdose deaths inside the facility due to the smuggling of dangerous substances like fentanyl and methamphetamine." *Id.* at 4, ¶ 10. And, according to Easter, the policy was "designed to eliminate discretionary, individualized decisions that could result in inconsistencies in treatment or security gaps." *Id.* at 4, ¶ 11. Again, as a practical matter, every person who is arrested and booked in Sedgwick County is strip searched.

**3.** Bastin presented Pray to the detention facility and Pray was subjected to processing pursuant to Easter's policy. Bastin and Pray first arrived at the sally port and then went into the work area. Doc. 89 at ¶ 23. In both of those areas, Pray observed a sign on the door declaring as follows: "All arrested persons will be strip searched beyond this point, regardless of charge. This includes felony, misdemeanor, & civil charges." Doc. 95 at 8–9, ¶¶ 20–21.

Bastin completed Pray's booking paperwork in the arresting officer work area. Doc. 89 at ¶ 23. Bastin then took Pray into the general booking area, meaning the facility now considered Pray to be in custody and "housed" in the jail's general population. *Id.* at ¶ 24; Doc. 91-2 at ¶ 9. Bastin, as an airport police officer, did not have any authority to determine whether Pray would be housed in general population due to the jail's policy of considering Pray to be in custody. Doc. 88 at ¶ 2.a.viii. But he was aware that the policy subjected anyone who

5

entered the general booking area or anywhere else in the jail proper (everywhere besides the sally port and officer work area) to a body-cavity strip search. Doc. 89 at ¶¶ 16, 25. Pray provided fingerprints, and he was photographed. *Id.* at ¶ 24.

One of the jail's officers, Corporal William Breit, led Bastin and Pray to another room to conduct the strip search of Pray. Doc. 89 at ¶ 27. Breit told Pray to remove his clothes and then searched Pray's clothing for forty-five seconds to one minute. *Id.* at ¶ 30. Breit then told Pray to "turn around," "bend over," and "cup his nuts." *Id.* The search lasted for two to three minutes, then Breit returned Pray's clothing to him. *Id.* at ¶¶ 30, 32.

Breit was aware of the jail's strip-search policy. He testified that he joined the Sedgwick County Sheriff's Office in 1999 and was promoted to Corporal in 2014. Doc. 91-3 at 5. During his tenure, he has read the strip-search policy and has received training on how to conduct a strip search. Doc. 95-4 at 3–4. He also understands when a court order is required to perform certain kinds of body-cavity searches. *Id.* at 4. More generally, Breit testified that he was trained on the law, and that he knew that he had a duty to refuse to follow an unconstitutional policy. *See* Doc. 95-2 at 2; Doc. 95-4 at 2.

Bastin observed the strip search. Doc. 88 at ¶ 2.a.vi. He was in the room for the search, but he "kept his head down and did not watch." Doc. 89 at ¶ 28. Specifically, Bastin "did not say anything during the search, did not give Pray any direction or instructions, did not ask Pray to disrobe, did not give Pray any instructions on how to present himself, [and] did not search Pray or his clothing." *Id.* at ¶ 31. Bastin had learned about the jail's new strip-search policy about a month before Pray's search occurred during one of Bastin's shift briefings. *Id.* at ¶ 13. Bastin, who was from the airport police staff, assumed the jail's policy was legal and asserts he "depended on the jail to post a lawful policy." *Id.* at ¶ 19.

After the strip search was completed, Pray was taken to the booking station. Doc. 89 at ¶ 34. Pray immediately began discussing how to pay bond with the jail officials. *Id.* He offered to pay his bond with a debit card or check, but learned that the facility would only accept cash. *Id.* Pray then called a friend, who came to the jail to pay his bond—it was $100. *Id.* at ¶ 37; Doc. 91 at 10, ¶ 46. In total, Pray was in the general booking area for around an hour before his release. Doc. 91 at 10, ¶ 47. Pray was never assigned to a holding cell or to the long-term

residential area, nor did he ever leave the general booking area because he posted the $100 bond and was released before assignment.

**4.** Pray filed this suit. Invoking 42 U.S.C. § 1983, he named Bastin, Breit, Easter, and the Board of County Commissioners for Sedgwick County as defendants. Doc. 35. He claims that the defendants violated his Fourth Amendment right to be free of unreasonable searches by applying a policy that requires jail officials to conduct a body-cavity search of every detainee who enters the booking area. Doc. 88 at ¶ 4.a.i. He seeks $150,000 in compensatory damages for the "humiliation, embarrassment and emotional distress he sustained from the illegal body-cavity strip search." *Id.* at ¶ 5. And he requests $250,000 in punitive damages, asserting that the defendants wantonly violated the Fourth Amendment. *Id.* The defendants moved for summary judgment on Pray's claim for various reasons, including both individual defendants' assertions of qualified immunity. Docs. 89 & 90.

**II**

The Tenth Circuit has held that corrections officials may only conduct a suspicionless strip search of an arrestee during the booking process once they have determined that the individual is destined for the jail's general population. *Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204 (10th Cir. 2020). Easter's policy violates this requirement. But, in this case, that conclusion means something different for each defendant. Each defendant's summary judgment argument is considered separately.

**A**

Invoking 42 U.S.C § 1983, Pray brings his claims against the defendants in their individual and official capacities. Specifically, he sues Easter in his official capacity, and the other two defendants—Breit and Bastin—in their individual capacities. Doc. 88 at ¶ 4.a.i. Section 1983 provides that "[e]very person who, under color of [state law,] subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. It creates no substantive rights but merely provides a mechanism for enforcing a right conferred by the Constitution or a federal statute. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002); *see also Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 174–75 (2023).

There are meaningful differences between the two types of claims Pray is asserting. As to the official-capacity claims against Easter, Pray is really asserting a claim against the entity for whom Easter was employed—the Board of County Commissioners of Sedgwick County, Kansas. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (applying *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)); *accord Cox v. Glanz*, 800 F.3d 1231, 1254 (10th Cir. 2015). To establish liability against the entity, a plaintiff must allege that his or her harm was caused by a constitutional violation committed by the entity's agent, *Camuglia v. City of Albuquerque*, 448 F.3d 1214, 1223 (10th Cir. 2006), and that the entity's custom, policy, or practice caused the unconstitutional conduct, *Monell*, 436 U.S. at 694–95. *See generally Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033, 1048–49 (10th Cir. 2024). In contrast, an individual-capacity suit under Section 1983, like what Pray brings against Breit and Bastin, holds a state actor personally liable for constitutional deprivations and "must be based on personal involvement in the alleged constitutional violation." *Brown v. Montoya*, 662 F.3d 1162, 1163 (10th Cir. 2011) (quoting *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997)).

Pray asserts that the defendants' conduct violated his Fourth Amendment right to be free from unreasonable searches. Doc. 88 at ¶¶ 1.a.d, 4.a.i. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "The basic purpose of this Amendment, as recognized in countless decisions of the Supreme Court, is to safeguard the privacy and security of individuals against arbitrary invasions by government officials." *United States v. Mathews*, 928 F.3d 968, 975 (10th Cir. 2019) (citing *Camara v. Mun. Ct. of S.F.*, 387 U.S. 523, 528 (1967) (internal quotations and citations omitted)).

Pray's claims implicate the legal framework governing the reasonableness of suspicionless strip searches in detention facilities under the Fourth Amendment. The Supreme Court has held that a detention facility may impose a blanket strip-search policy that does not require individualized suspicion if the facility has "determine[d] that the detainee 'will be' placed in general population." *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 322 (2012). But in *Florence* the Court declined to address the constitutionality of blanket strip-search policies in situations where the facility has not yet determined that the detainee is destined for placement in the jail's general population. *Id.* at 338–39.

The Tenth Circuit construed *Florence* in *Hinkle v. Beckham County Board of County Commissioners*, 962 F.3d 1204 (10th Cir. 2020). It held that absent individualized suspicion warranting a strip search, a jail may not strip search a detainee as part of the booking process until an officer has decided that the detainee will be housed in general population. *Hinkle*, 962 F.3d at 1237. This is because "absent admitting the detainee to the jail's general population, the jail would have no need to protect the new detainee, the existing detainee population, and the detention staff from infectious diseases, rival gang members, weapons, or contraband." *Id.* That does not, however, allow jails to classify an entire facility as part of general population so that they can strip search every arrestee. *Id.* As the Tenth Circuit noted: "We would reject any argument that the County—for administrative convenience—could treat all its incoming detainees as bound for its jail's general population, thus allowing universal strip searches." *Id.* at 1237–38. Otherwise, the distinction that the Supreme Court described in *Florence* regarding the prison's interest in conducting invasive strip searches of detainees that will enter the jail's general population, as opposed to other environments within the facility, would be rendered meaningless. *Id.* at 1238.

**B**

In many Section 1983 cases involving discretionary choices made by individual officers, the analysis begins by considering the conduct of the officer(s). But the allegations and evidence in this case concern actions undertaken pursuant to and in conformance with Easter's policy. As a result, the following considers first whether the policy required officers to undertake unconstitutional actions and then evaluates the individual-capacity claims.

**1**

Pray sued Easter in his official capacity, alleging that his policy requiring strip searches of everyone in custody—meaning everyone who starts the booking process—violates Pray's Fourth Amendment right to be free from unreasonable searches.[2] Doc. 88 at ¶ 4.a.i. A municipal

---

[2] Initially, Pray also sued the Board. Doc. 88 at 1. The Board moved for summary judgment, demonstrating it played no role in creating, implementing, or enforcing the jail's strip-search policy. Doc. 91 at 21. Pray's response seeks to voluntarily dismiss his claim against the Board. Doc. 95 at 20. As a result, the Board's request for summary judgment is granted.

officer in his or her official capacity may be held liable under 42 U.S.C. § 1983 for constitutional violations, but not by way of respondeat superior. *See Monell*, 436 U.S. at 691; *City of St. Louis v. Praprotnik*, 485 U.S. 112, 128 (1988). Liability exists only when the harm-causing conduct was undertaken pursuant to an official municipal policy or custom. *See Monell*, 436 U.S. at 691; *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479–80 (1986). Such claims "aris[e] from a formal regulation or policy statement, an informal custom that amounts to a widespread practice, decisions of municipal employees with final policymaking authority, ratification by final policymakers of the decisions of subordinates to whom authority was delegated, and the deliberately indifferent failure to adequately train or supervise employees." *Hinkle*, 962 F.3d at 1239–40.

Acknowledging *Florence* and *Hinkle*, Easter contends that his official policy does not compel conduct in violation of the Fourth Amendment because a housing decision had been made and individuals being booked would intermix with other detainees in a shared environment.[3] Doc. 91 at 2. Based on the uncontroverted facts, Easter's request for summary judgment fails.

*Hinkle* forbids Easter's policy because it indiscriminately treats every incoming detainee "as bound for [the] jail's general population, thus allowing universal strip searches" regardless of where, how, or even if they will be detained. *Hinkle*, 962 F.3d at 1237–38. It does this by classifying the entire facility as general population. This type of overbroad classification is an impermissible attempt to render meaningless the distinction *Florence* recognized between general population and those merely being temporarily detained. *See id.* That rule is not new. The Tenth Circuit held more than thirty years ago that "the security concerns inherent in a bail situation are very different from those present when the detainee will enter the jail for a greater length of time." *Cottrell v. Kaysville City*, 994 F.2d 730, 735 (10th Cir. 1993).

---

[3] Easter's summary judgment papers do not appear to dispute that the other prerequisites of *Monell* liability—namely causation and scienter—are present. *See Hinkle*, 962 F.3d at 1240 ("For the causation and state of mind elements, Hinkle can satisfy his burden by demonstrating that the County's policy is facially unlawful."); *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404–05 (1997) (same).

Easter's policy actually prevents his officers from making any determination about whether a detainee will be detained in general population before conducting a strip search. That gets the order backwards because the detention decision is the one *Hinkle* and *Florence* requires before a strip search occurs. *Hinkle*, 962 F.3d at 1237 (noting that *Florence* depended on a facility determining whether the arrestee will be housed in general population and holding that this housing determination must "precede[ ] the strip search"). To do otherwise puts the proverbial cart before the horse: "In *Florence*, the Court repeatedly stressed that the strip search comes after the facility determines the detainees 'will be' placed in general population." *Id.* (quoting *Florence*). Easter's policy compels conduct that offends the Fourth Amendment and, as a result, Easter's request for summary judgment must be denied.

### 2

Easter offers two arguments in support of his position that his policy complies with the Fourth Amendment. Neither is persuasive.

**a.** Easter first argues that the unique concerns present in detention facilities justify his blanket policy of compelling suspicionless body-cavity strip searches of every arrestee. Doc. 91 at 12–15. Pointing specifically to *Florence*, Easter asserts that his strip-search policy is necessary to ensure the safety of the jail's staff and detainees from contraband. *Id.* True, the Supreme Court acknowledged in *Florence* that jails face heightened health and safety concerns that warrant deference to prison administrators' judgment in crafting adequate policies to address those issues. *Florence*, 566 U.S. at 331–34. But corrections officials' discretion to select a remedy for those concerns is not unlimited. The Supreme Court explained that safety and operational concerns may not justify a blanket strip-search policy "where, for example, a detainee will be held without assignment to the general jail population and without substantial contact with other detainees." *Id.* at 338–39. Yet that is exactly what the policy Easter adopted does. And, as applied to the uncontroverted facts in the summary judgment record, the application of Easter's policy resulted in a suspicionless strip search of Pray who paid his $100 bond before being housed in general population.

It is no answer that Easter has made the decision to allow those assigned to the long-term areas to intersperse with individuals arriving for booking. *Contra* Doc. 91 at 5 & 17 (suggesting that arrestees are allowed to interact with inmates). Just as jail officials may not broadly

categorize the entire facility as general population, jail administrators cannot make decisions to permit interaction and then claim a need to conduct suspicionless strip searches of every arrestee. The two groups can and should remain segregated. Or, if both groups needed to be in the booking area at the same time, jail officials could search detainees before they returned to the long-term areas.

**b.** Easter also argues that these policy concerns justify his decision to consider every arrestee who enters the booking area as "in custody" and, as a result, subject to a body-cavity strip search. Doc. 91 at 17–19. Specifically, he points to the administrative difficulty in predicting "which detainees will bond out, because experience has shown such predictions to be unreliable and susceptible to manipulation." *Id.* at 17. And, invoking an ends-justify-the-means logic, he asserts that the policy has improved safety in the facility, leading to "a substantial reduction—approximately 50%—of contraband being distributed" throughout the jail. *Id.* at 18. Although the concerns he identifies are weighty, the Tenth Circuit has found them insufficient to justify the type of broad, automatic search at the level of intrusion that a body-cavity strip search invokes. *Hinkle*, 962 F.3d at 1237–38 (noting that body-cavity strip searches "are not so trivial" to allow all detainees to be considered bound for the jail's general population for administrative convenience, even in light of the safety and health concerns that are present in a detention facility); *see also Hill v. Bogans*, 735 F.2d 391, 394–95 (10th Cir. 1984) ("A jail's desire to maintain security, to avoid charges of discriminatory treatment, and to promote administrative convenience simply does not justify routine searches in a public area of persons detained for minor traffic offenses."). That conclusion controls. *See generally Thompson v. Masterson*, ___ F. Supp. 3d __, 2025 WL 3088942, at *12 (D. Kan. Nov. 5, 2025).

The only two cases Easter identifies as supporting his position are inapposite. *Contra* Doc. 91 at 16 (citing *United States v. Sutton*, No. 24-3037, 2025 WL 263565 (N.D. Iowa Jan. 22, 2025), and then citing *Rattray v. Woodbury Cnty.*, 908 F. Supp. 2d 976 (N.D. Iowa Dec. 10, 2012)). For one thing, they are not binding. Decisions of a "federal district court judge [are] not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011)). For another, they actually undermine Easter's position. In each, the district court recognized that jail personnel may conduct a strip search before the jail decides that he or she will be housed in general population if

the detainee will "be housed with other detainees for some period of time before either being released or being designated to the general population." *Sutton*, 2025 WL 263565, at \*5; *see also Rattray*, 908 F. Supp. 2d at 997–1000. Easter's policy does not even satisfy those cases, as his policy requires a strip search of anyone entering the facility, regardless of how long they will be held or, as in Pray's case, whether they will be held. But more importantly, as *Sutton* noted, the rule the Iowa cases applied conflicts with *Hinkle*, which requires jail officials to decide that an arrestee will be housed in general population *before* subjecting him or her to a suspicionless body-cavity strip search. *Hinkle*, 962 F.3d at 1242.

\* \* \*

Courts give correctional officials substantial deference to craft and implement administratively feasible policies in response to legitimate security concerns. But that discretion does not extend to a universal strip-search policy requiring suspicionless body-cavity strip searches of *all* arrestees who enter the jail's booking area. *Hinkle*, 962 F.3d at 1237–38. And, as a result, Easter's motion for summary judgment must be denied.

## C

The two individual defendants, Breit and Bastin, invoke the doctrine of qualified immunity in response to Pray's claims. Doc. 89 at 14–16; Doc. 91 at 18–20. Pray overcomes Breit's assertion of qualified immunity, but he has failed to identify authority clearly establishing that Bastin had a duty to intervene in the unlawful strip search.

### 1

Qualified immunity attempts to balance competing interests. Suits against government actors allow those wronged by government misconduct a method of redress. *See Anderson v. Creighton*, 483 U.S. 635, 638 (1987) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982)). But non-meritorious suits exact a high cost from society and government officials by unduly interfering with the discharge of official duties. *See id.*; *see also Horstkoetter v. Dep't of Pub. Safety*, 159 F.3d 1265, 1277 (10th Cir. 1998). So government officials performing discretionary duties are immune from suit when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable official would have been aware. *See Pearson v. Callahan*, 555 U.S. 223, 231

(2009); *see also Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (recognizing municipalities may not rely on their officers' entitlement to qualified immunity). Whether an official is immune turns on the objective reasonableness of the official's actions, considering the laws clearly established at the time the official acted. *See Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012). Objective reasonableness is not an exacting standard; qualified immunity protects all but the plainly incompetent or those who knowingly violate the law. *See White v. Pauly*, 580 U.S. 73, 79 (2017); *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Once a defendant asserts entitlement to summary judgment on the basis of qualified immunity, the plaintiff has the burden to prove two things. First, the plaintiff must show that a jury could find the defendant's conduct violated the Constitution or laws of the United States. *Packard v. Budaj*, 86 F.4th 859, 864 (10th Cir. 2023). Second, the law must have been clearly established at the time of the alleged conduct such that the defendant had fair notice that his or her conduct was unlawful. *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021) (per curiam). If both inquiries are answered in the affirmative, summary judgment must be denied unless the defendant proves "there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." *See Emmett v. Armstrong*, 973 F.3d 1127, 1132 (10th Cir. 2020) (internal quotation marks and citations omitted).

Discerning whether the relevant legal rule was clearly established is a narrow and context-specific exercise. *See Bond*, 595 U.S. at 12; *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (per curiam). In short, the precise contours of the legal right must have been so clear that every reasonable official in that circumstance would have understood what he or she was doing violated that right, leaving no debate as to the lawfulness of the conduct in the particular situation. *See Mullenix v. Luna*, 577 U.S. 7, 13–14 (2015); *Reichle v. Howards*, 566 U.S. 658, 664 (2012); *Ashcroft v. al-Kidd*, 563 U.S. 731, 740 (2011); *see also Rivas-Villegas*, 595 U.S. at 5–8 (reversing a denial of qualified immunity where the precedent relied upon had "materially distinguishable" facts that "did not give fair notice" to the official).

Practically, this means a "Supreme Court or Tenth Circuit decision" must have held that the same conduct (or very nearly the same conduct) as the conduct at issue is a violation of law. *Wise v. Caffey*, 72

F.4th 1199, 1209 (10th Cir. 2023).[4] To be sure, a case "directly on point" is not necessary for a right to be clearly established, but existing precedent must have placed the constitutional question "beyond debate." *White*, 580 U.S. at 78–79.

**2**

Breit asserts that he is entitled to qualified immunity because his conduct—in conformity with Easter's policy—did not violate the Fourth Amendment. Doc. 91 at 18–19. This argument fails because, according to the summary judgment record, Breit conducted a suspicionless strip search of Pray based on the jail's unconstitutional policy prior to making the decision to place Pray in the jail's general population. Doc. 89 at ¶ 4. By applying a policy that subjected all arrestees to a body-cavity strip search to Pray, Breit engaged in conduct that the Fourth Amendment precludes. *See Pahls v. Thomas*, 718 F.3d 1210, 1225 (10th Cir. 2013) (noting that a defendant's direct participation in a constitutional violation may give rise to individual liability under Section 1983).

Breit also asserts Tenth Circuit precedent did not clearly establish that his conduct was unlawful. Doc. 91 at 19–20. That argument is foreclosed by *Hinkle*, which was decided three years before Breit's conduct. *Hinkle*, 962 F.3d at 1237–38 (applying *Florence*, which was decided eight years earlier).

Yet even *Hinkle* was not a watershed event. Rather it recognized a bright-line rule based on principles that have been applied in the Tenth Circuit for decades. *See Hinkle*, 962 F.3d at 1238–39 (collecting cases); *Warner v. Grand Cnty.*, 57 F.3d 962, 964 (10th Cir. 1995) ("On [January

---

[4] The Supreme Court has never held that circuit precedent may be a dispositive source of clearly established law, opting instead to assume without deciding that it might. *See City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (citing *City & County of San Francisco v. Sheehan*, 575 U.S. 600, 614 (2015)), which cited *Carroll v. Carman*, 574 U.S. 13, 17 (2014), which, in turn, cited *Reichle*, 566 U.S. at 665–66); *see also Wilson v. Layne*, 526 U.S. 603, 617 (1999) ("If judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy."). But the Tenth Circuit has, holding that a "constitutional right is clearly established when a Tenth Circuit precedent is on point, making the constitutional violation apparent." *Apodaca v. Raemisch*, 864 F.3d 1071, 1076 (10th Cir. 2017); *Est. of Ceballos v. Husk*, 919 F.3d 1204, 1213 (10th Cir. 2019).

24, 1991], it was clearly established in this circuit that a brief intermingling with the general jail population does not justify a strip search absent reasonable suspicion of drugs or contraband."). As a result, Tenth Circuit law not only held that a jail policy authorizing strip searches before a decision is made to house a detainee in general population is unlawful, but also expressly recognized that this requirement had been clearly established law in the Tenth Circuit since the early 1990s. *See Hinkle*, 962 F.3d at 1238–39 (collecting cases).

The facts in *Hinkle* are sufficient to put any reasonable officer on notice that it is unlawful to strip search every arrestee who enters the booking area before a determination to house the arrestee in general population. The only distinction between the policy in *Hinkle* that was found to violate the Fourth Amendment and Easter's policy, is that Easter administratively characterizes the entire booking area as general population. *Compare Hinkle*, 962 F.3d at 1237–38, *with* Doc. 89 at ¶ 23. Easter's distinction is plainly impermissible, as *Hinkle* recognized that the Fourth Amendment does not permit a jail to avoid the Fourth Amendment by creatively categorizing the entire facility as general population. *See Hinkle*, 962 F.3d at 1237–38. The law was sufficiently clear that any reasonable officer should have known that mechanically strip searching anyone entering the booking area without making the housing decision required by *Florence* and *Hinkle* violated clearly established Fourth Amendment law. *See id.* As a result, Breit's request for summary judgment based on his assertion of qualified immunity must be denied. *Cf. Stonecipher v. Valles*, 759 F.3d 1134, 1148 n. 9 (10th Cir. 2014) (noting that an individual is permitted to raise the qualified immunity defense at successive stages of litigation).

**3**

It is different, however, for Bastin. He did not participate in the strip search in any way other than being in the room when it occurred. Bastin argues that he did not violate Pray's Fourth Amendment rights because he was a mere bystander to Breit's unconstitutional strip search of Pray. Doc. 89 at 12. His argument springs from the textual requirement of causation found in Section 1983, such that any individual defendant's liability must be based on that individual causing the deprivation. *Cuervo v. Sorenson*, 112 F.4th 1307, 1314 (10th Cir. 2024). This is frequently referred to as personal participation—personal involvement in the constitutional violation. *Pahls*, 718 F.3d at 1225.

Personal participation, however, "is not limited solely to situations where a defendant violates a plaintiff's rights by physically placing hands on him." *Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008). An officer may also be liable for causing the deprivation under Section 1983 by failing to intervene in an ongoing constitutional violation. *See id.* In particular, a plaintiff may state a claim for a defendant's failure to intervene by alleging that a government officer violated the plaintiff's constitutional rights, the defendant (who is also a government officer) observed the violation, and the defendant could have intervened but failed to do so. *Bledsoe v. Carreno*, 53 F.4th 589, 616 (10th Cir. 2022). On this notion, Pray asserts that Bastin caused his Fourth Amendment violation by failing to stop Breit's unconstitutional strip search.

Pray cannot establish that Bastin's failure to intervene violated clearly established law.[5] That is, no Tenth Circuit or Supreme Court precedent clearly indicates that an airport public safety officer who neither conducted the arrest nor had any responsibility for booking or admitting an arrestee into the Sedgwick County detention facility had an affirmative duty to intervene in the booking officer's decision to strip search Pray. Among other things, there is no indication he knew or should have known that, in this particular instance, a housing determination had been made. Qualified immunity is necessary because there is no evidence establishing that Bastin possessed actionable information that would make intervention obligatory or that he should have intuitively recognized as much as the events were unfolding. *See Ziglar v. Abbasi*, 582 U.S. 120, 150–51 (2017) (recounting cases where the Court recognized qualified immunity provides officers with breathing room to make reasonable but mistaken judgments); *Groh v. Ramirez*,

---

[5] It is not obvious that Bastin's failure to intervene caused Pray to be subjected to an unconstitutional strip search. To be sure, a government officer—Breit—violated his constitutional rights. *See* Part II.C.2, *supra*. And Bastin observed the violation without saying or doing anything. Doc. 89 at ¶ 28. But there appears to be no evidence that Bastin had knowledge that the Sedgwick County officers had failed to make a detention decision beyond the initial decision to book Pray into the facility before the strip search occurred. That knowledge imbalance is a critical component of a duty to intervene. *See, e.g., Krueger v. Phillips*, 154 F.4th 1164, 1211 (10th Cir. 2025). As a result, the analysis focuses only on whether Bastin's conduct violated clearly established law. *Andersen v. DelCore*, 79 F.4th 1153, 1163 (10th Cir. 2023) (noting discretion to choose which prong to consider).

540 U.S. 551, 567 (2004) (noting that qualified immunity covers not only the officer's mistake of law, but also his or her mistake of fact or mistake based on mixed questions of law and fact).

In addition, Tenth Circuit precedent does not clearly establish an officer's duty to stop all types of constitutional violations. In the context of an excessive force claim, the Tenth Circuit announced the general proposition "that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Shaw v. Schulte*, 36 F.4th 1006, 1020 (10th Cir. 2022) (citing *Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1210 (10th Cir. 2008)). But in many excessive force cases, the need to intervene is obvious because of the ability to appreciate the incongruence between the physical force and the situation being addressed. And although the Tenth Circuit has not expressly limited the duty to intervene to excessive-force cases, its application is not so easily transferrable in other contexts. For example, the Tenth Circuit has held that the need to intervene that exists in the excessive force context does not always exist in the illegal search and seizure context. *See, e.g.*, *Shaw*, 36 F.4th at 1020. In *Shaw*, the Tenth Circuit rejected the argument that *Vondrak* clearly established a duty to intervene in all police-citizen encounters, such as a stop that had become impermissibly prolonged. *Id.* at 1020–21.

As in *Shaw*, Pray has not identified any law that would clearly establish an officer's duty to intervene in another officer's unconstitutional strip search pursuant to a policy governing that other officer and his or her agency. Instead, he asserts that the jury should decide as an issue of fact whether or not Bastin had sufficient opportunity to stop Breit's unlawful strip search. Doc. 94 at 12. But whether the law is clearly established is a question of law for the court to decide. *See Gonzales v. Duran*, 590 F.3d 855, 859 (10th Cir. 2009). In other words, a plaintiff seeking to overcome qualified immunity must demonstrate that the law was sufficiently clear such that only the defendant "is plainly incompetent or . . . knowingly violate[ed] the law." *Malley*, 475 U.S. at 341. That is because qualified immunity protects officers who have "reasonable, but mistaken beliefs" and operate at the sometimes "hazy border" of the laws. *Saucier v. Katz*, 533 U.S. 194, 206 (2001). Bastin is entitled to qualified immunity because Pray has not and cannot identify any law that would have met this standard.

Nor has he provided authority suggesting that an officer's duty to intervene is clearly established where the officer knew of a policy but

lacked authority to decide whether it was being applied in an unconstitutional manner. *Cf. Shaw*, 36 F.4th at 1020 (concluding that the law was not clearly established in part because the trooper who observed the unlawful prolongation of the traffic stop was not part of the officer's decision to prolong it). It is true that Bastin was aware of Easter's strip-search policy and understood that pursuant to the policy any arrestee who entered the general booking area would be subjected to a body-cavity strip search. Doc. 89 at ¶¶ 16, 25. But it would not be unconstitutional if, for example, the officer had made a detention determination or had individual suspicion that the arrestee possessed contraband, as either would permit such a search. It is only when the search precedes a detention determination or occurs without individualized suspicion that the violation of *Florence* and *Hinkle* occurs. The record is insufficient to establish that Bastin knew the application of the policy against Pray constituted a violation of his Fourth Amendment rights. Indeed, Bastin did not have any authority to determine whether the jail would accept custody over Pray and, as a result, strip search him. Doc. 88 at ¶ 2.a.viii. Instead, it was Breit (a jail officer) who instructed Bastin and Pray to follow him into a room to conduct Pray's strip search. Doc. 89 at ¶ 27. Under these facts, it cannot be said that Bastin's conduct offended clearly established law by failing to intervene.

## D

One final damages issue remains. Breit moves for summary judgment on Pray's request for punitive damages, asserting that he did not possess the requisite mental state for a reasonable jury to award that relief. Doc. 90 at 20–21.[6] Not so.

In a Section 1983 suit, punitive damages may be awarded "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983); *accord Eisenhour v. Weber Cnty.*, 897 F.3d 1272, 1280–81 (10th Cir. 2018). A plaintiff need not prove that the defendant "engaged in egregious misconduct." *Eisenhour*, 897 F.3d at 1281. Rather, "[i]t is the

---

[6] Bastin also moves for summary judgment on Pray's request for punitive damages. Doc. 89 at 16–17. Pray's response seeks to voluntarily dismiss his claim for punitive damages against Bastin. Doc. 94 at 13. As a result, Bastin's request for summary judgment on the punitive damages issue is granted.

defendant's mental state, not the scope of the harm, that counts." *Id.* Evidence that the defendant knew that his or her conduct was unlawful is sufficient for the jury to exercise its discretion of whether to award the punitive damages that a plaintiff requests. *Id.* at 1282.

Pray has presented that evidence. In other words, there is evidence from which a jury could infer that Breit knew that it was unlawful for him to conduct the strip search of Pray. Breit testified that he joined the Sedgwick County Sheriff's Office in 1999 and was promoted to Corporal in 2014. Doc. 91-3 at 5. During his tenure, he has read the strip-search policy and has received training on how to conduct a strip search. Doc. 95-4 at 3–4. He also understands when a court order is required to perform certain kinds of body-cavity searches. *Id.* at 4. More generally, Breit was trained on the law, and he knew that he had a duty to refuse to follow an unconstitutional policy. *See* Doc. 95-2 at 2; Doc. 95-4 at 2. Despite possessing this knowledge, he conducted an impermissible strip search of Pray long after the Tenth Circuit had clearly established that such conduct was unlawful. *See* Part II.C.2, *supra.* From this evidence, it cannot be said, as a matter of law, that Breit lacked the requisite state of mind to support a punitive damages award. *See Eisenhour*, 897 F.3d at 1282 (concluding that there was sufficient evidence to submit the punitive damages instruction to the jury where the defendant was trained on the law, had received repeated trainings on the issue, and had engaged in the alleged conduct long after the law was clearly established). Although a jury might find that Breit did not know the Sheriff's policy was unlawful, Pray has presented sufficient evidence to preclude summary judgment on the issue.

### III

For the foregoing reasons, Bastin's Motion for Summary Judgment, Doc. 89, is GRANTED, and the Board, Easter, and Breit's Motion for Summary Judgment, Doc. 90, is GRANTED in part and DENIED in part.

It is so ordered.

Date: December 17, 2025          _s/ Toby Crouse_____
                                 Toby Crouse
                                 United States District Judge